UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

BONNIE RAMSDELL,                          )
                                          )
                Plaintiff,                )
                                          )
        v.                                )        No. 1:11-cv-00398-GZS
                                          )
AETNA LIFE INSURANCE COMPANY,   )
                                          )
                Defendant                 )

## RECOMMENDED DECISION

Bonnie Ramsdell sued Aetna Life Insurance Company pursuant to the Employee

Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B).  Ramsdell claims

that Aetna should have paid short-term disability benefits because of her anxiety, depression, and

post-traumatic stress disorder.  Ramsdell and Aetna have filed cross motions for judgment on the

administrative record (ECF Nos. 26, 27).  Aetna also filed statements of material facts (ECF Nos.

28, 29) and an opposition to Ramsdell's motion for judgment (ECF No. 30).  I recommend that

the Court grant Aetna's motion for judgment and deny Ramsdell's motion for judgment.

## FACTS

In 2004, Ramsdell began working at Huhtamaki Americas, Inc., which manufactures

packaging and food service products, in Waterville, Maine.  Ramsdell's job was part of the

"rough finish dry end crew" and required physical exertion.  (Compl. at 2, ECF No. 1.)  On May

23, 2006, she reported that she was a target of sexual harassment and retaliation at work.

According to Ramsdell's complaint, the harassment consisted of comments that her lips were

"pursed like a vagina" and that she wanted a coworker to have sex with her; the placement of

pornographic magazines in front of her face; a coworker's motioning that he was going to grab

her buttocks; and a coworker's swinging of a broom near her head and then breaking the handle, resulting in "shards [falling] towards her face." (Compl. at 4.) Ramsdell received ten sessions of psychological counseling from June 2006 to June 2007 with Patricia Grenier, a licensed clinical social worker, through Huhtamaki's employee assistance program.

In late 2009, Ramsdell was receiving treatment for depression from her primary care physician, Dr. Julie Phelps. After a follow-up appointment on December 21, 2009, Dr. Phelps noted that the course of Ramsdell's depression was decreasing and that it was "much improved." (R. 254.)[1] However, Ramsdell had not been sleeping well due to "more stuff going on at work." (R. 254.) Dr. Phelps reported that Ramsdell was "still trying to get a new job and [was] pursuing legal recourse against her employers." (R. 255.) Dr. Phelps planned to follow up in two months.

On February 18, 2010, Ramsdell claims that she "suffered a breakdown" when Huhtamaki directed her "to work alongside her chief harasser." (Pl.'s Mot. for J. at 3, ECF No. 26.) Ramsdell sought help from Martha Ellis, a licensed clinical social worker, through Huhtamaki's employee assistance program. Ellis's notes indicate that Ramsdell was "suspended for creating an emotional scene on the job." (R. 258.) On February 22, 2010, Ellis reported that Ramsdell was "clearly experiencing anxiety in response to [her] work situation" and felt "helpless and hopeless about any change occurring." (R. 258.) Ellis found that Ramsdell "presents with very wide eyes, shaky voice, and tearfulness. . . . She states she wants to do her job but is unable to do so due to the impact of the environment on her emotionally. She describes an inability to sleep, shakiness, and anxiety attack — including chest pain when thinking about going to work." (R. 259.) Ellis concluded that Ramsdell's "symptoms are evident in talking about returning to work." (R. 259.) Ellis did not interact with Ramsdell after February 22, 2010. However, Ellis prepared a discharge summary on March 16, 2010, indicating

---

[1]       The Administrative Record consists of one bound volume on file in the Clerk's Office.

that Ramsdell experienced "panic or anxiety attacks, even at the thought of going to work," chest pain, flat affect, shaky voice, wide eyes, difficulty sleeping and concentrating, hopelessness, sadness, low energy, and a lack of interest in activities.  (R. 279.)

Ramsdell's follow-up appointment with Dr. Phelps occurred on February 23, 2010.  Dr. Phelps noted that Ramsdell was "under a lot of stress and doesn't feel she can go back to work tomorrow.  She has been placed on the same shift with the man who has repeatedly sexually harassed her and when she complained about it her boss told her she 'had no credibility and that if she becomes that upset again at work she will be fired.'"  (R. 260.)  Dr. Phelps advised Ramsdell to leave work and look into Huhtamaki's disability policies.  Dr. Phelps wrote: "Ultimately I think she needs to leave her job in order to feel better."  (R. 261.)

Ramsdell then applied for short-term disability benefits from Aetna, which administers them on Huhtamaki's behalf and has discretion to determine an employee's eligibility.  The policy provides that an employee is disabled if she is "not able, solely because of disease or injury, to perform the material duties of [her] own occupation."  (R. 4.)  As part of Ramsdell's application, Dr. Phelps completed Aetna's behavioral health clinician statement on February 25, 2010, indicating that Ramsdell could not work at any job for three months.  (R. 262-63.) According to Dr. Phelps, Ramsdell exhibited "slight agitation" and a "very depressed mood" but had no other behavioral problems and no cognitive and emotional limitations.  (R. 262.) Although Ramsdell had insomnia and could not work, Dr. Phelps indicated that she could perform activities of daily living, including driving, shopping, paying bills, and cleaning her residence.  Dr. Phelps also reported that Ramsdell switched from taking Zoloft to Lexapro.  (R. 263.)  On March 2, 2010, Dr. Phelps completed Aetna's certification of health care provider for employee's serious health condition pursuant to the Family and Medical Leave Act (FMLA).  (R.

3

269-72.)  Dr. Phelps repeated her assessment that Ramsdell was unable to perform any of her job functions for three months.

After filing her claim with Aetna, Ramsdell returned to Grenier for treatment, which consisted of nine sessions from March 1 to June 7, 2010.  Grenier began by performing a psychosocial assessment on March 1, 2010.  (R. 212-13.)  Ramsdell described the harassment to Grenier and disclosed that she had a sexual relationship with a detective hired by Huhtamaki to investigate the harassment.  Grenier found that Ramsdell was "anxious, panicky, [and] sad," but otherwise had no problems with appearance and behavior, attitude and sensorium, and perception and thought content.  (R. 212.)  Ramsdell also had intact judgment and good cognition and insight and was fully oriented.  Grenier reported her clinical impression that Ramsdell "presented with significant anxiety, tearfulness, agitation, and pressured speech.  She reports sleep difficulties, concentration difficulties, recurrent distressing dreams, and intrusive recollections of the harassment.  She experiences intense psychological distress at exposure to cues that symbolize aspects of the harassment, exaggerated startle response, and hyper vigilance."  (R. 212.)  Grenier also noted that Ramsdell was "increasingly isolating herself."  (R. 212.)  Grenier diagnosed her with post-traumatic stress disorder and assigned a global assessment of functioning (GAF) score of 50, indicating serious symptoms or serious impairment in social or occupational functioning.  (R. 213.)

On March 5, 2010, Ramsdell attended another follow-up evaluation with Dr. Phelps, who reported that she "feels well with no complaints."  (R. 273.)  Although Ramsdell suffered from "a persistent pattern" of depression, the course was decreasing.  (R. 273.)  The symptoms were linked to "stress, early morning awakening . . . feeling tired and lack of energy."  (R. 273.)  Dr.

Phelps indicated that Ramsdell was not experiencing panic attacks, was "not nearly as anxious," and "doesn't have much ambition still." (R. 273.)

In response to questions from Aetna on March 6, 2010, Dr. Phelps specified that Ramsdell had "major depression" and experienced "panic attacks characterized by racing heart, diaphoresis and chest pressure which impair her function. She has anhedonia [and is] unable to leave her house. These occur daily." (R. 275.) Dr. Phelps explained that Ramsdell was "on antidepressant therapy and receiving counseling" and that Dr. Phelps and Ramsdell met for follow-up appointments every two to four weeks. (R. 275.)

Dr. Phelps's next report is dated April 1, 2010. Ramsdell complained of a headache, and Dr. Phelps found that it was "associated with anxiety and depression." (R. 281.) However, Dr. Phelps noted that Ramsdell "feels well with no complaints. . . . She doesn't feel as depressed, but has fears about leaving her house and feels unmotivated." (R. 281.) Dr. Phelps was "not sure if her inability to leave the house is related to depression or fear of running into her colleagues," and was also not sure if her headaches resulted from increased Lexapro or from menopause. (R. 282.)

On April 2, 2010, Aetna denied Ramsdell's claim. (R. 178-79.) She sought review of the denial, but Aetna again denied the claim on May 4, 2010. (R. 190-92.) However, Aetna requested further documentation from Ramsdell, specifically the results of a mental status examination showing the "frequency and duration of panic attacks, [and] functional or cognitive impairment." (R. 191.) Ramsdell acquired the following additional medical records during May and June 2010 and then submitted them to Aetna.

On May 4, 2010, Dr. Phelps noted that Ramsdell "feels well with minor complaints," that her headaches had ceased, that she had an "intermittent pattern" of depression, and that she was

5

"terrified to leave her house and never answers her phone." (R. 195.) According to Dr. Phelps, Ramsdell 'has been waking up with very scary dreams . . . with her heart racing every night in the last 2 weeks. Some of this seems to be triggered by her finally trying to go out to look for a job. She dreams that . . . one of the Huhtamaki employees is harassing her." (R. 195.) Dr. Phelps recommended that she keep working on her anxiety with Grenier. (R. 196.)

Grenier's progress notes indicate Ramsdell's anxiety, agitation, tearfulness, feelings of fear, sleep disturbances, and social isolation, but also show some improvement by June 7, 2010. (R. 215-16.) In addition to the progress notes, Grenier prepared a summary of her counseling of Ramsdell dated May 19, 2010, in which Grenier repeated her diagnosis of post-traumatic stress disorder originally made on March 1, 2010. (R. 283.) On May 24, 2010, at the end of the three-month period in which Dr. Phelps had reported that Ramsdell was unable to work, Dr. Phelps noted that Ramsdell "has recently been diagnosed with PTSD and depression and [is] still unable to work due to these medical conditions." (R. 284.)

Having obtained all of Ramsdell's medical records through June 2010, Aetna referred the case for review by an outside psychologist, Dr. Elana Mendelssohn. Dr. Mendelssohn examined the records and conducted peer-to-peer consultations with Grenier and Dr. Phelps, both of whom stated that Ramsdell would not be able to work in a different environment. (R. 288-89.) On July 16, 2010, Dr. Mendelssohn submitted her report, concluding that the evidence failed to support Ramsdell's claim. (R. 285-90.) Dr. Mendelssohn determined that Ramsdell's emotional distress was limited "to her particular work environment and coworkers as opposed to global impairment in psychological functioning which would preclude [her] from performing her specific job duties." (R. 289.) Dr. Mendelssohn explained that Ramsdell's symptoms, including pressured speech, agitation, and reduced concentration, "were primarily evidenced when [she] discussed

6

her work-related issues." (R. 289.) Although Ramsdell felt threatened, there were no reports of direct threats made by her coworkers. Furthermore, Grenier and Dr. Phelps had not reported "the presence of ongoing panic attacks" in their consultations with Dr. Mendelssohn. (R. 289.) Dr. Mendelssohn noted Dr. Phelps's inconsistent reports that panic attacks were absent in her office notes from March 5, 2010, yet present in her responses to Aetna's questions on March 6, 2010. Dr. Mendelssohn recommended that Huhtamaki "consider a change in work venue" for Ramsdell and suggested that Ramsdell could provide additional documentation to support her claim, such as "results of a formal mental status examination, performance-based tests of psychological functioning with standardized scores, or behavioral observations with the frequency, duration, and intensity of symptoms observed." (R. 290.)

On July 21, 2010, Aetna informed Ramsdell of its final decision upholding the denial of her claim based on her medical records and Dr. Mendelssohn's review. (R. 250-52.) Ramsdell then filed the present case pursuant to ERISA on October 24, 2011. (ECF No. 1.)

## LEGAL STANDARD

It is undisputed that the ERISA Plan provides Aetna with discretion to determine eligibility for benefits. Consequently, this Court must uphold Aetna's decision unless it is arbitrary, capricious, or an abuse of discretion. Cusson v. Liberty Life Assurance Co. of Boston, 592 F.3d 215, 224 (1st Cir. 2010) (citations omitted). "In other words, the administrator's decision must be upheld if it is reasoned and supported by substantial evidence. . . . Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary." Gannon v. Metropolitan Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004) (citations Omitted).

DISCUSSION

The parties' arguments concern (1) whether substantial evidence supported Aetna's denial of benefits and (2) whether Aetna's structural conflict of interest motivated the denial of benefits.

**A. The Record Evidence**

Ramsdell relies on the following evidence in arguing that Aetna's denial of benefits was arbitrary and capricious. Grenier and Dr. Phelps both indicated that Ramsdell was unable to work because of her psychological condition. Dr. Phelps diagnosed her with major depression, citing her daily symptoms including racing heart, diaphoresis, chest pressure, anhedonia, and inability to leave her house. Dr. Phelps reported that these symptoms were also triggered when Ramsdell tried to find a new job, thus showing that she could not work. Grenier summarized Ramsdell's anxiety, tearfulness, agitation, pressured speech, sleep difficulties, concentration difficulties, psychological distress, and social isolation. Grenier and Dr. Phelps also engaged in peer-to-peer consultations with Dr. Mendelssohn, providing the same opinions that appeared in the medical records. (Pl.'s Mot. at 11-14.)

Aetna cites the following evidence in arguing that its denial of benefits was supported by substantial evidence. Dr. Phelps's behavioral health clinician statement indicated no cognitive or emotional limitations, few behavioral problems, and the ability to perform activities of daily living such as driving and shopping, but Dr. Phelps inconsistently noted that Ramsdell was afraid to leave her house. Dr. Phelps did not observe any totally disabling neurological or cognitive impairments at any time, and she inconsistently reported both the presence and absence of panic attacks. Grenier's assessment did not find significant problems with Ramsdell's appearance and behavior, attitude and sensorium, perception and thought content, judgment, cognition, insight,

or orientation.  Dr. Mendelssohn's analysis did not support Ramsdell's claim.  (Def.'s Mot. at 14-18, ECF No. 27;  Def.'s Opp'n to Pl.'s Mot. at 12-15, ECF No. 30.)

The Court must uphold Aetna's decision if it is reasoned and supported by substantial evidence.  Considering all of the evidence, I conclude that it is reasonably sufficient to support Aetna's decision denying benefits.  Ramsdell's providers frequently indicated that she fell short of the disability policy's standard of inability to perform the material duties of her occupation.  For example, Ellis found that Ramsdell's anxiety was clearly demonstrated, but it related specifically to her current work situation, not to all work situations.  (R. 258-59.)  Dr. Phelps repeatedly concluded that Ramsdell could function in most respects, that her depression was decreasing, and that she lacked ambition and was unmotivated.  (R. 262-63, 273, 281.)  Dr. Phelps's reports of Ramsdell's panic attacks were inconsistent, as were Dr. Phelps's notes that Ramsdell could not leave her house yet could drive, shop, and keep her medical appointments.  (R. 262, 273, 275.)  Dr. Phelps linked only some of Ramsdell's symptoms to her search for a new job and noted that she would feel better when she found such a job.  (R. 195, 261.)  Grenier also tied Ramsdell's psychological distress to the alleged harassment, not to the performance of the material duties of her occupation.  (R. 212.)  Grenier further noted that Ramsdell's condition had improved over the course of her therapy.  (R. 215-16.)  All of this evidence is reasonably sufficient to show that Ramsdell could perform the material duties of her occupation.  Although the record contains contrary evidence, particularly the conclusions of Grenier and Dr. Phelps that Ramsdell could not work, that evidence does not make Aetna's decision arbitrary.

Ramsdell further argues that Aetna improperly rejected the opinions of Grenier and Dr. Phelps in favor of the opinion of Dr. Mendelssohn, who did not personally examine and treat her.  In Ramsdell's view, Dr. Mendelssohn is biased in favor of insurers, and Ramsdell cites several

federal cases criticizing Dr. Mendelssohn's work in those cases.  (Pl.'s Mot. at 14-19.)  Aetna argues that it properly relied in part on Dr. Mendelssohn's report, citing several federal cases agreeing with Dr. Mendelssohn's conclusions in those cases.  (Def.'s Mot. at 18-19; Def.'s Opp'n at 9-12.)  I agree with Aetna's argument.  "[N]othing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003)."[I]t is not 'for a court to determine precisely how much weight [an insurer] should have accorded [a particular piece of evidence] in its overall decision.'"  Tsoulas v. Liberty Life Assurance Co. of Boston, 454 F.3d 69, 77 (1st Cir. 2006) (quoting Gannon, 360 F.3d at 214).  Therefore, Aetna was not bound to give great weight to the opinions of Grenier and Dr. Phelps.  Aetna could properly engage an outside reviewer such as Dr. Mendelssohn and give more weight to her report.

Ramsdell also argues that Aetna inadequately considered her subjective symptoms, which she claims are impossible to verify objectively.  (Pl.'s Mot. at 20.)  Although it is "impermissible to require objective evidence to support claims based on medical conditions that do not lend themselves to objective verification, such as fibromyalgia," it is "permissible to require objective support that a claimant is unable to work as a result of such conditions."  Desrosiers v. Hartford Life & Accident Co., 515 F.3d 87, 93 (1st Cir. 2008).  See also Cook v. Liberty Life Assurance Co. of Boston, 320 F.3d 11, 21 (1st Cir. 2003) (discussing fibromyalgia and chronic fatigue syndrome).  Because Ramsdell offers no support for the proposition that there can be no clinical objective evidence of anxiety, depression, and post-traumatic stress disorder, I conclude that this argument is inapposite.  I also determine that Aetna was not required to assign great weight to Ramsdell's subjective symptoms, just as Aetna was not required to accept the opinions of Grenier and Dr. Phelps.

Finally, Ramsdell contends that Aetna should have developed the record by following Dr. Mendelssohn's recommendation and seeking a formal mental status examination and other evaluations for Ramsdell.  (Pl.'s Mot. at 13, 16-18.)  However, it is the plaintiff's burden to prove entitlement to benefits by providing evidence of her disability.  <u>Morales-Alejandro v. Medical Card System, Inc.</u>, 486 F.3d 693, 700 (1st Cir. 2007).  Aetna was not required to shoulder Ramsdell's burden.

**B. Structural Conflict of Interest**

Ramsdell notes that Aetna has a structural conflict of interest because it determines whether to pay benefits and also pays the benefits.  (Pl.'s Mot. at 9-10, 15-19.)  Ramsdell contends that the denial of benefits was improper because of this inherent conflict and Aetna's use of Dr. Mendelssohn's review, rejecting the opinions of Ramsdell's treating providers.  Aetna responds that there is no evidence that its structural conflict of interest influenced its decision in this case.  (Def.'s Opp'n at 2-5.)

Pursuant to <u>Metropolitan Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 116-18 (2008), a structural conflict of interest is only one of many factors to be considered in determining whether there was an abuse of discretion under the circumstances of a particular case.  The conflict may be a significant factor when there is evidence of "a history of biased claims administration" but a less important factor when "the administrator has taken active steps to reduce potential bias and to promote accuracy."  <u>Id.</u> at 117.

Ramsdell has not put forth evidence indicating that Aetna's conflict should be a significant factor in this case.  In contrast, Aetna explains that it has complied with <u>Glenn</u> by instituting measures to decide claims accurately regardless of outcome.  (Def.'s Opp'n at 3-4.)  As to Aetna's reliance on Dr. Mendelssohn's review, I explained above that it was proper for

Aetna to engage her services and that various federal courts have both criticized and agreed with Dr. Mendelssohn in the past.  Her recommendation that Aetna reject the opinions of Grenier and Dr. Phelps and deny Ramsdell's claim does not show that she was biased in favor of Aetna. Substantial evidence supported Dr. Mendelssohn's finding that Ramsdell had not proved her inability to perform the material duties of her occupation.  I conclude that Aetna's structural conflict of interest does not suggest an abuse of discretion in Ramsdell's case.

### CONCLUSION

Based on the foregoing, I recommend that the Court grant Aetna's motion for judgment and deny Ramsdell's motion for judgment.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

July 31, 2012